We'll hear argument first this morning in Case 10-1016, Coleman v. The Court of Appeals of Maryland. Mr. Foreman. Thank you, Mr. Chief Justice, and may it please the Court. The propriety of any Section 5 legislation is judged by reference to the historical perspective that it reflects. And that historical perspective is very clear, and it's set very clearly by Congress and by this Court. It is an unfortunate, long history of State-sponsored gender discrimination. And those — that discrimination embodies gender-based stereotypes that took a very firm hold in the employment area, where women had difficulty obtaining employment and holding employment. And this Court, in a litany of cases, recognized these gender-based stereotypes as — as an improper assumption about women's abilities. In Frontiero v. Richardson, it rejected this issue that women's mission were to be women — to be wives and mothers. Stanton v. Stanton, that women were to be the homemaker and men the breadwinner. And — Well, Mr. Foreman, I guess the question in this case is what this particular statutory provision has to do with gender discrimination and the history of gender  discrimination through this provision, or whether it was trying to do something else entirely. And it was directly attempting to address these gender-based stereotypes in a couple different ways. As a practical matter, at that time, when an employer saw a woman, they didn't necessarily just see a worker. They saw a person that could become pregnant and worked on these gender-based stereotypes, that that woman would either become pregnant, would be disabled because of pregnancy-related disabilities, but in any event was a least — least attractive employee. And the Family and Medical Leave Act addresses that specifically in its purposes section. It specifically says that it's intended to promote the equal opportunity for women and men pursuant to the Equal Protection Clause. But more specific to the self-care provision, Congress made it very clear what they were attempting to do. If you move to the findings section, first in finding number 6, they address what — Where are you reading from, counsel? I am reading from Appendix A to the brief, and it is that employee-in-one standards that apply to one gender only have a serious potential for encouraging employers to discriminate against employees and applicants of employment who are of that gender. That's the negative inference argument that we make in our brief. But even more to the point, if you move to the purpose sections at Appendix 2, page of Appendix 2, it specifically is intended to minimize the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons, including maternity-related disabilities, and for compelling family reasons, and to ensure equal protection clause. Alito, we're following up on Justice Kagan's question. I have — I have difficulty seeing how providing 12 weeks of leave for self-care for both men and women affects the incentive of an employer who we will assume has an inclination to discriminate against women based on the possibility that a woman applicant for employment may become pregnant. I just don't see how that would affect the incentives of an employer in that situation. The rationale of Congress at that point was that they could address this issue several different ways, and they passed A, B, and C, the birth of the child, the adoption of the child, and the Family and Medical Leave Act, against, again, addressing gender-based stereotypes. Well, A is not at issue, right? Okay. So we're just dealing with D, which concerns a serious health condition. So you have an employer who's willing to discriminate on the basis of gender, and the employer has two applicants for employment, a man and a woman, and the employer says, well, if I hire the man, he might take 12 weeks of leave for a serious medical condition, and if I hire the woman, she might take 12 weeks of leave for a serious medical condition, which might be something that either men or women could get, or it also could be a sickness related to pregnancy. So there still is — there still would be an incentive for this hypothetical employer to discriminate against the woman. But one of the things Congress tried to do is to take that incentive away. How does it do that? That's what I'm — I understand that, and it's a worthy objective. I just don't understand how giving both men and women 12 weeks of leave for self-care affects the incentive. It affects the incentive by providing — it becomes the equal opportunity employer. It evens the ground, and the way it would do it is an employer, if you just have A through C, can look at an employee and, based upon gender stereotypes, would make the assumption that the women, because of historically the role they were required to play, would be taking all the leave under A and B and C. And so why would I even hire that woman in the first place? But women don't get sick less often than men, do they? No, absolutely. So you're just adding something to both sides of the balance, and it doesn't affect the employer's incentive. The employer is still — the hypothetical discriminatory employer would still say, well, women are going to be caregivers more often, so I'm going to not hire that person. But under A, B, and C, after the family and medical leave, an employer would look and say both men can take these now, and I think we need to step back. And that's why A, B, and C go to the problem, but what does D have to do with it? If you assume that both men and women get sick at an approximately equal rate, maybe you don't assume that, but if you do, it doesn't seem to factor into the employer's incentives in any way. There's nothing in the record that demonstrates that there's a differential rate between the self-care rate for men and women. But the perception was that women, because of pregnancy, because of pregnancy-related disabilities, would in fact take more leave. And so that I would look at a woman as an employer and say, she will become pregnant, she will take leave, she will be disabled. However, with D now, a man can take a disability leave on the same basis, and the hope of Congress was not that it would happen immediately, but by the — what would happen is with the application of family medical leave, at some point men would be taking A, B, and C, and in fact women and men would be taking family and medical self-care leave. Ginsburg. Mr. Foreman, I think everyone has been trying to get you to focus on the health care and sickness leave alone, and in the portions of the act that this Court upheld, the Congress said there is this close association of women with children. We think it's going to be good for everybody if fathers recognize their responsibility for elderly parents, sick children, sick spouse. So we can see the rationale trying to change this stereotype, trying to open up caregiving for both sexes. But you have answered the question that women and men get sick. There's no disproportion. So how do you tie that, just that part of the act, where there isn't the obvious association of women with childbearing, so we extend the benefit to men, so they'll be associated with child care. There isn't that same link here, is there? I think it is the same linkage trying to address — it's addressing a different stereotype, but it's addressing the linkage that women will in fact take pregnancy-based leave or pregnancy-based disabilities and therefore are less attractive, less employees. And that's what self-care was intended to do. Kagan. Let me just make sure I understand. You're saying that Congress is thinking that an employer actually does think that women take more sick leave because women get pregnant. And just as Congress was thinking about the employer who thought women are going to take more family leave, you think Congress was thinking about the employer who thinks women are also going to take more sick leave because of pregnancy. Absolutely, Your Honor. And in response to Justice Alito's question, and I'm sorry if I gave a confusing response, there are two separate ways of addressing that. You can look at self-care as a standalone provision. Without A, B, and C, Congress passed just self-care. In that case, it would be responding to exactly that type of gender stereotype, and 12 weeks would be a congruent and proportional response. The other way to look at it is that's not the way Congress passed the bill. They passed it as a comprehensive response with A, B, and C, and hence D then becomes a bit of an equalizer to take away this negative incentive that only women would take A, B, and C. So there's two separate ways that this Court can get to the same conclusion, and that conclusion is that this is a congruent and proportional response to gender-based discrimination. Kagan. Do you have any evidence that Congress, in fact, was thinking about either of these two things? Is there anything in the record that suggests either of those two theories? Yes. There is, Your Honor, and let me take the negative inference first because I think looking at the statute as a comprehensive makes sense, is it was introduced and I'm reading from page 43. It's referenced on page 43 of our brief. But starting in 1987, National Women's Political Caucus testified, quote, My primary purpose is to stress that parental and medical leave are inseparable in the words of the old song, you can't have one without the other. And the point she then later on to explain was parental leave without medical leave would encourage discrimination against women of childbearing age who constitute approximately 73 percent of all women in the workforce. Employers would tend to hire men who are much less likely to claim, make this claim. Fast forward to 1993 at the time of the passage of, and this would be on page 42 of our merits brief, a law providing special protection to women or any defined group in addition to being inequitable runs the risk of causing discrimination. The FML addresses this by addressing the needs of all workers, avoids this risk. The FML is based on the guarantees of equal protection. So it addresses that aspect of, it addresses that aspect. Sotomayor, I take your argument, but if you look at the legislative record, the reports, the findings, et cetera, and the statements repeatedly by many Congress people, there appears to have been a dual motive for this provision. They were, in fact, engaged in the question of discrimination against pregnant women. That was recognized in Hibbs, and that's clear. But with respect to this particular provision, they were also concerned about economic effect that happened to everyone, men and women, who became disabled. And so they appear to have had dual motivation. Part of the bill was gender-related. Part of the bill seemed to be disability-related. How do we judge that kind of bill where Congress may have been expanding the benefits it's giving to people, not solely because of gender discrimination, but because of this desire to address disability discrimination? Justice Sotomayor, I think the way you judge it is relying on what Congress's expressed findings and provisions are. And to the extent this Court makes a determination that the FMLA is responsive to gender-based discrimination, then how Congress chose to address that is congruent in proportion. The fact that Congress may also have had other motives, that there was a concern with families and that families are benefits, should not be used to undermine the fact that Congress indeed was acting pursuant to one of its broadest powers, Section 5 of the Fourteenth Amendment, and therefore that their considered judgment is a congruent and proportional response. Part of the findings is clearly reflective of the fact that this covered both governmental employers and private industry. So there was reference to commerce cause type of analysis, which my colleagues raised repeatedly in their brief. But the Congress needed to do that because they were regulating private employment, but at the same time recognized to the extent that we are going to regulate State-based content. Alitoso, with respect to the Commerce Clause, could I ask you this? If we were to disagree with you on the Fourteenth Amendment and hold that it, that Congress didn't validly abrogate State sovereign immunity with respect to subsection D, would your client still be able to seek reinstatement or other injunctive relief? Justice Alito, I think what you're responding to, and you'll clearly correct me if I'm wrong, but I think what you're responding to, is there an Ex parte Young action here that would be made, able to be made consistent with the Commerce Clause, under the Commerce Clause? And the answer is, and I know both Justice Kennedy and Justice Rehnquist, I think, in one of his dissents, pointed out in the Family and Medical Leave Act that the employee may not be left out in the dark because there is an Ex parte Young claim. A couple points on that. This here, the district court completely dismissed your FMLA claim, not just insofar as you sought damages. I think you also sought reinstatement, another equitable relief, but the district court dismissed it completely. That's correct. We're not contesting that, are you? We're not contesting it consistent with any Ex parte Young claim. What the district court did was say the claim is totally dismissed based on Eleventh Amendment immunity. But if I could try to respond to your question more specifically, this Court has never, as a Court, held that Ex parte Young type of action is available in this type of claim. Assuming that it is not. Kennedy, because this is for money damages. Pardon? Because this is for money damages, Ex parte Young was just injunctive relief. Eleventh Amendment primarily protects the treasuries of the State against money damages. Correct. It's not Ex parte Young. Correct. But as you pointed out in your dissent in Hibbs, that Ex parte Young may be available,  but the court has never held that. I believe that is, in fact, the correct interpretation of the law, that it would be available for injunctive relief. However, the Court has never defined the parameters of what an Ex parte Young action really gives a plaintiff, and that becomes very important in this case. But is that in this case? That's basically what I'm asking. If we were to disagree with you on the Fourteenth Amendment, are you asking us simply Would we then simply affirm the Fourth Circuit, or would we have to make some accommodation for the possibility that the dismissal of your claim insofar as you sought injunctive relief may have been improper? I think you would have to make that accommodation, but with respect, Your Honor, I think that would be an incorrect approach. And here's the reason why an Ex parte Young, a perfect example of this would be a perfect approach. I'm only trying to be a little bit helpful to you, Your Honor. And apparently, I missed that, and I apologize for it. What relief did you ask for? Damages we know, and you have to overcome the Eleventh Amendment. Injunctive relief you don't, but did you ask for it? In the complaint itself, it does not ask for injunctive relief pursuant to the Family and Medical Leave Act. There were combined claims. I thought you did, but maybe I'm reading your complaint more generously than you read it yourself. I'd go with Justice Alito here. If that's your reading of it, we will certainly accept your reading of it. You must have asked for such other and further relief. But again, back to the Ex parte Young, in the case Nelson v. University of Tennessee in Texas, the case that dealt with exactly with this issue of abrogation of Eleventh Amendment immunity, and they found that there was valid abrogation of Eleventh Amendment immunity, the State of Texas, then the Court was required to address the Ex parte Young issue, and the State of Texas argued that reinstatement is not an appropriate remedy under Ex parte Young, and that while the Fifth Circuit ultimately rejected that, that is an argument that employees would have to face what are the parameters of Ex parte Young, and more importantly, that is not the remedy that Congress in their considered judgment believed was the appropriate remedy to address gender-based discrimination. Ginsburg. Congress must have thought that giving the woman back her job was an important part, that the whole idea is she wasn't supposed to be fired. So I think that the relief, the non-monetary relief, is certainly important. It is extremely important, but Congress did not stop there. Congress decided it needed to take one step further and there needed to be monetary relief, and I think Mr. Coleman's case illustrates exactly why. Here, Mr. Coleman exercised his rights that were supposedly guaranteed him under the family medical leave and, indeed, under a State law, and the State of Maryland  did not do the same thing the next time if the only thing that you can get is possibly injunctive relief prohibiting them from doing that in the future and maybe reinstatement two or three years down the line. Employees at that point cannot put their lives on hold. They have a duty to go out and try to mitigate, try to find another job. What's an employer to do? And Congress said there needs to be more. We passed Title VII to try to address gender-based discrimination, the Pregnancy Discrimination Act, but there were still voids. And the Family and Medical Leave Act attempts to fill those voids, and one of those voids is try to provide a monetary incentive so that the State of Maryland and private employers were, in fact, complied with the law. Ginsburg, when you say you're concerned about a disincentive to hire women, but the Pregnancy Discrimination Act makes that unlawful. So if an employer decides, I don't want to hire women of childbearing age, that is an out-and-out violation of the Pregnancy Discrimination Act, isn't it? That is, Your Honor, but the Pregnancy Discrimination Act did not fill the other gap which the Family and Medical Leave Act did. But you're relying on the incentive, the disincentive to hire women of childbearing age. The law protects the woman of childbearing age by saying, employer, you can't refuse to hire her, promote her and all the rest, because of pregnancy. What the Pregnancy Discrimination Act provided was that you needed to treat pregnancy-related disabilities as you would other short-term disabilities. So if an employer decided not to provide your childbearing age, that is an out-and-out violation of the Pregnancy Discrimination Act. Ginsburg, I'm just asking you about, your argument rests on an employer acting unlawfully. You say, he won't hire, we have to give the medical leave to everyone, because otherwise the employer won't hire women. And that's the question I'm asking is, you are assuming that the employer will break the law by refusing to hire women that have childbearing age. I don't want to make that assumption. In my incentive argument, I was using Mr. Coleman's example of why Congress could have made a determination that monetary relief would be appropriate in the family and medical care. But your argument, to a large extent, depends on, you say, Congress did this because they wanted to eliminate or at least reduce one kind of discrimination against women in the job market. Yes. And that discrimination was refusing to hire women of childbearing age. Well, they couldn't do it out-and-out, because that would be a violation of the law. So is Congress having in mind discrimination that is under the radar screen, that is under the radar screen, even though it's unlawful? I don't think that was Congress's intent, and that's not what was reflected. I think, again, they were trying to address it on two separate levels, one, the gender-based discrimination, the gender stereotype, that women simply become less attractive, and in the broader statute, to prevent the negative inference, so that all — that ultimately where we would get in society is the ability to take pregnancy-related leave, other leave, would not be viewed as a negative inference running against women, and therefore women ultimately would become a non-issue. And I see the white light's on, so if I could reserve the balance of my time. Thank you, counsel. Mr. Howard. Thank you, Mr. Chief Justice, and may it please the Court. In order to affirm in this case, the Court need go no further than to distinguish Hibbs. And we think Hibbs is readily distinguishable, and I'd like to highlight four principle — Need go no further? I'm sorry. I didn't — I'm sorry, Justice Ginsburg. Need go no further than simply to distinguish Hibbs. And we think there are at least four distinctions that we'd like — I'd like to highlight today. The first is one that's, Justice Kagan, your question goes to, which is subsections A, B, and C are all related in some fashion to women's roles with respect to work and family. Subsection D really does not speak to that purpose. And I think my second sort of distinction I would point to is — Stop you there, Mr. Howard, for a second. I took from Mr. Foreman something that I hadn't understood from his briefs, maybe I just missed it, which is that he's making a kind of analogous argument that just as in the prior provisions of the Act, employers thought of women as caregivers and the response of Congress was to provide a gender-neutral leave benefit that had both — that both women and men were eligible for. So here, employers think of women as needing more medical leave because of pregnancy and the response of Congress is to provide gender-neutral sick leave. So what is your response to that argument? Congress did — Justice Kagan did not, I think, take that stereotype or perception that Mr. Foreman referred to into account. And I'd specifically point the Court to page 21 of our brief where we cite some Bureau of Labor Statistics studies indicating that men and women at the time took roughly the same amount of sick leave. In fact, Mr. Foreman has conceded as much. And that same study projects that men and women will take roughly the same amount of time after the enactment of the FEMA. Sotomayor, there certainly was — there was certainly much conversation and testimony that whether they in fact took the same amount of leave time or not, that women who were pregnant or perceived as capable of getting pregnant were hired less frequently because subjectively the employers thought that they were more likely to take the time. So, frankly, for years there was questions about whether law firms were hiring young — not hiring young women because they feared they would leave in the middle of a big case or something else. We all know those stories. So it is sort of common knowledge in many ways, but there was plenty of testimony related to that. So assume that that was Congress's perception, because it was supported by the record or as much of the record as Hibbs recognized as adequate, where does that leave your argument? Well, I would make a couple of points in response to that, Justice Sotomayor. First, the Pregnancy Discrimination Act was already in place, and so to the extent there were perceptions that employers might discriminate based on pregnancy disabilities, that would be unlawful under Title VII as amended by the Pregnancy Discrimination Act. And the fact that — and you are quite right that there is a fair amount of discussion in the legislative record, although I think it's less of a predominant theme than the concern for job security for working families. But there certainly is discussion about pregnancy discrimination and pregnancy disability as a type of illness. But we, again, would note that this is valid Commerce Clause legislation. And so to the extent that kind of discrimination was occurring and leave was being denied or women were suffering adverse consequences in the workplace as a result of pregnancy discrimination, they could enforce the 12 weeks through a Title VII action. They couldn't — Pregnancy Discrimination Act says you have to treat pregnancy like any other disability. So if they're not giving anybody any leave for anything, they don't have to give any leave, 12 weeks, not one day. And that's what — that's the gap that this legislation fills. It says, yes, you do have to provide leave for women who have disabling conditions, including pregnancy, but then you have to give that to men as well. You can't reserve that for the one sex. So it was the gap in the Pregnancy Discrimination Act that this was referring to. Yes, I agree, Justice Ginsburg. But the gap that existed was the absence of a guaranteed period of leave. In other words, it was the absence of a substantive entitlement to a certain amount of leave. And, in effect, the gap that was being filled served as prophylaxis for Title VII, but not for constitutional violations. Now, I assume for the sake of argument that for the applicants for particular provisions, particular positions, I should say, where the applicants are typically of a certain age, men tend to take less sick leave than women because women also take sick leave for pregnancy-related illnesses. So giving everybody 12 weeks eliminates the possibility that women are women who will be take ñ want to take additional ñ want to take more sick leave will be fired because they exceed the amount of sick leave allowed by the employer for everybody. Now, isn't that connected to eliminating discrimination in employment? Justice Alito, I think that one could argue that that is connected with eliminating pregnancy disability discrimination. It's also connected to the purposes of A, B, and C. I think that the principal reason why employers do view potential hires as, when they're women, as likely to take a lot of time off, I think goes more to the family caretaking provisions. And I think that's largely reflected in the record. Alito I don't think ñ I have difficulty with the incentives argument, either ñ honestly, either as to D or as to C. But I'm just talking about an argument based on consequences. If an employer says you get 2 weeks of sick leave, period, after that, if you can't come back, you're fired, that may, at least for applicants within a certain age range, that may have a much more severe or a more severe impact on women than on men. Yes, Justice Alito, and I think what ñ What would the answer to that be, that that's not intentional discrimination? That would certainly be part of the answer. And what I was going to say was that what you are describing is a disproportionate impact on women as a result of assumptions concerning pregnancy disability. And, of course, if States were engaging in this kind of conduct or if there were a disproportionate impact, that would not state an equal protection violation under Washington v. Davis. Breyer, why are you separating the four things? I mean, I've heard, it seems to me, three separate rationales. One, the easiest, is in D itself, sometimes a woman could have a miscarriage. And, of course, she has to stay home. And that isn't covered by A, B, or C, so we cover it in D, you know. And then we put the men in, too, because we don't want to make this incentive just to not hire women. That's one. The second one was the one Justice Ginsburg brought up, that there is a gap in the So here it is, D. And the third one, which I think was related to what Justice Alito just said, is when you have to read it together to understand the third one, you get 12 weeks altogether. All right? Now, that means once you put in D, this Act will have less of a bad effect. The bad effect of the Act is if you protect the women, then the employers say, well, we're not going to hire women, perfect. We have to give them 12 leaves, we'd have to give the men, they have a terrible disincentive. But then they worked out how to lessen the disincentive. And the way you do that, you say 12 weeks overall, and now look what happens. A woman wants to take, say, 12 weeks to look after her family, and she gets separately sick. Four more weeks, but how many does she get? Answer? Twelve, right? Twelve, you could answer that. Now, let's think of the man. Let's think of the man. The man would like to look after the family, say, for 6 weeks, and he gets sick. Four weeks. How many weeks have we got? Ten. Ten, thank you. All right. I like these questions. So, perfect. So now, the employer's sitting at the table, and it will work with other numbers. I don't rely on that. But now look what happens. Without this Act, he's got a woman who is going to be out of there. I mean, with the Act, unless we put in 4, unless we put in the fourth part of it, we have a woman who's gone for 12 weeks and a man who's gone maybe for 6, but maybe for 0, okay? Maybe for 6. With the Act, the woman's gone for 12, the man's gone for 10. You see? And so the comparison there, and it will work with whatever numbers you want, the comparison there is very different. And the comparison doesn't total erase the problem with the woman, but it may reduce it to a size where the Act itself will no longer act as such a disincentive to hiring a woman. We have three different rationales. All of them are related to a serious problem, which is the problem of discrimination against women, because the employers think they'll be home more. And so you see the conclusion I'm drawing to it? Yeah, okay. So where are we? Well, let me speak first to the second one, the concern about the gap. The gap that is filled by the 12 weeks is a — is to provide a substantive entitlement, and when it permits a claim, damages claim, enforceable against a State treasury, it provides an entirely — it requires a different justification than simply to fill a gap with a substantive entitlement. It becomes a— The idea is it's part of one package. I think that's what Justice Breyer was getting at. I mean, just suppose that Congress wanted to improve conditions for the — in the job market for women, which I think it's fair to say was the motivating force behind this Act, and they also wanted to protect families so that six children, six spouses are attended to. Now, what leave policy would say, okay, to do that, we will have leave when a spouse is sick, a child is sick, a parent is sick, but not when the worker herself is sick? I mean, that — it's all part of one package which is designed to increase job security for women and increase protection for their families. So I don't think you can slice off D from the other three. Justice Ginsburg, I think you can separate D. On the same analysis that this Court applied in Tennessee v. Lane, in contrast to the Garrett case, in Lane, of course, different sections of the same Anti-Discrimination Act required different analysis and reference to different parts of the record. There was a single overarching purpose, to prevent discrimination against persons with disabilities. But the operation and effect of the particular claim requires a different analysis. As Justice Stevens said, the Court's not required to evaluate statutes as an undifferentiated whole. Breyer. No, it doesn't have to, of course. But the whole point of the question that I was asking was, sure, what helps you by doing it separately is it helps your case. But if we look at what Congress was trying to do, they were trying to do it as a whole. That's my point that I wanted to answer, and they're trying to do it as a whole because no matter what numbers I use, if I look at it without D — is it D? Yeah, D. If I look at it without D, the ratio will disfavor the woman. And if I look at it with D, suddenly the ratio from the point of view of the employer of the disadvantage of hiring a woman over hiring a man, it goes way down. And that helps women. And that is why, I think, reading this and listening, a major reason why they put in D as part of the other, because working with that 12-week limitation and the whole rest of the statute, we now have a statute that doesn't defeat itself. We now have a statute that actually can achieve the end of leading employers to not discriminate against women. Not perfectly, but there's a big improvement, and that's the argument I'm making. You have to read it as a whole to see that. And that's what I — I wonder if there's an answer to that. Of course, I'm at the moment thinking there isn't an answer to it, but I ask the question because I want to hear what you say. Well, with respect to the ratio, I think the premise of that point is that women will take more leave for serious health conditions than men. And I don't think that's borne out, and, you know, Mr. Foreman has recognized as much. So I don't think the ratio really changes. Alito, what if Congress had added three additional subsections here and said that an employer has to provide 12 weeks of unpaid leave so that an employee can go to a health spa, 12 weeks of unpaid leave so that the employee can travel, 12 weeks of unpaid leave so that the employee can take an educational course? Now, that — those could be taken advantage of by either men and women. It makes both men and women increasingly unattractive as employees and therefore reduces the — any special disincentive that might have been created by A, B, and C. Now, on that same logic, would those be — would those be provisions that further the elimination of discrimination based on gender? You know, I think even if one accepted the premise, and we don't, that women take more leave for health conditions, that would further dilute the ratio to have available all those types of leave. Now, I've thought, for example, one could imagine — Sotomayor, Justice Alito was trying to help you. He was. He was. His question is he's absolutely right. And that's why this isn't a health spa thing, D. This is, in fact, has two independent reasons, the miscarriage reason and the Pregnancy Act reason. And so it isn't just saying go to a health spa. But, I mean, I don't want to put arguments in your mouth, which I just have, which you wouldn't like there anyway, because — but I would appreciate your going on with this discussion in respect to what Justice Alito and I have been talking about, and I would be interested in what you think. And I'm working from a different proposition than you are in response to this question. I don't think that the actual amount of time that men and women take is relevant. The question is what is the employer's perception, and did Congress have a valid basis, as Justice Kagan pointed out earlier, to believe that employers thought women took more time? I think that if — even if that were correct, and I don't think it is, because I think the overwhelming themes in the legislative record as a whole really were a concern for working families, whether single-income, double-income, and the concern that if a woman is going to have severe financial security, and then there was also concern against discrimination against persons with illness. But I think that one thing I'd like to emphasize is that your suggestion, Justice Sotomayor, and really almost all of the discussion here today, I think, explains why this is good social policy. We support it. But I don't think that we've really gotten anywhere near the necessary predicate of unconstitutional State conduct when the constitutional right is defined with some precision. And I think one has to define this right as disability. And I think also the protections that the Pregnancy Discrimination Act already had in place when added with the substantive — to the substantive entitlement as a matter of Commerce Clause legislation to this lead. Alito, if the State of Maryland thinks this is good social policy, why is it asserting its sovereign immunity? Well, that's a good question, and I think we're here mainly on we need to defend this on principle. Justice Kennedy, you've pointed out a number of your opinions. The exercise of the Section 5 power alters the Federal State. But you can waive. Can't you waive your 11th Amendment immunity? We could. I believe that's this Court's view. Well, you can provide the kind of relief that's sought here without waiving immunity, right? It's a matter of legislation. Yes. I think that's right. And there are — Can I just get back to the discussion before about how D relates to the others? Yes. Who do you think benefits most from subsection E, men or women? That's the one about armed services obligations at the time the law was passed? I assume, and I haven't studied the history of that, but I assume that just based on the demographics of the military, it's likely that there are more men in service deployed and that more women and wives benefit from that provision. That wasn't part of the original act, was it? No, it was not. And so that was a concern, was a discrete concern for veterans. Yes. And we have not. It wasn't part of the package that was the Family Medical Leave Act. No. And we are not suggesting that. We haven't raised that as a point in our briefs or here today. And, Mr. Howard, I do think that the point about the package is that if you look at everything else, you have a good point, that it seems to be related to economic security, which is not a section 5 issue, that it seems to be related to discrimination against sick people, which would also put us in a different legal universe. But when you look at D as passed at the same moment on the basis of the same record as A, B, and C, with the overwhelming purpose of Congress being to protect women from discrimination in the workplace because of unfair, stereotypical views about what women do as workers, then D assumes a different kind of aura. And you can talk about a number of theories for that, but I guess I would just ask for your reaction to that, that D is just part of a package which was about telling employers, get rid of your old stereotypes, don't act on your old stereotypes, employ women. Well, I would respond in part, and I'm going to accept your proposition that I should discuss these provisions as part of a single package. But from the standpoint of States, subsection D provides a separate claim, a separate basis to sue States, and we think that claim is incongruent, disproportionate to any conceivable unconstitutional conduct that it might prohibit. And I think this is borne out in the case law. We've surveyed the 40 Federal cases that we could find under subsection D only to involve pregnancy-related disabilities. Only one of them alludes in passing to headaches arising from pregnancy along with other stress-related conditions. But all the others really have to do with men and women benefiting from this leave for to care for a serious health condition. So I would really emphasize in response to your question that one could look at it as a package, but from the standpoint of States, it's a separate and independent claim, and it's an extraordinarily broad one. And it is not necessary, not simply because Pregnancy Discrimination Act claims are available, but, Justice Alito, there are ex parte young claims available. In response to your question, in this case at the Joint Appendix, pages 3 to 12, the amended complaint reveals that injunctive relief was sought, albeit, and on page 12 is the prayer for relief, it's not clear whether that relief is sought under Title VII or FEMLA or both. But the reason why I don't think the claim fails separate and apart from any sovereign immunity argument, of course, ex parte young is not protected on that ground. But there's some focus in the legislative history, particularly on the family that has a single parent, much more often a woman, not a man, and the devastating impact on that family of the woman getting sick, the sole breadwinner getting sick. So there was certainly a problem for families with only one breadwinner, and Congress was focusing on those women and wanting to have job security for them. That wasn't the only group of women, but certainly that affected this Act as it came out, didn't it? Yes. There is discussion in the record of the disproportionate impact that you say, but what is left out — well, it is found in other parts of the record that the relevant Is that a closed record? I mean, is that a closed record the way a record of a case is? I'm not sure I understand the question.   talk about in the record. What you're talking about is legislative history. I misspoke. I do mean the legislative history. The relevant comparison, we think, is not between single parent families who were predominantly women, but between working families where it could be two parents with a single income, man or woman. It could be a family with two incomes, but neither one can be lost. And in any event, I think we're talking now about a disproportionate impact, which would not state an equal protection violation. It's a question of how Congress would do it if they provided only for the woman who's the single head of the family. Then that would be vulnerable under equal protection because they didn't provide it for men. I think one would need to find, as this Court's cases have emphasized, a widespread pattern of unconstitutional conduct in the part of States. And I think the circumstances, Justice Ginsburg, that you've described do not flow from unconstitutional State action. They have their roots in other socioeconomic causes. Ginsburg. But to leave is a remedy for the problem. I think there's really not much disagreement about the problem, that there is gender discrimination in the job market. Yes. And then the question is how do we remedy that? Well, I don't think by providing the very sweeping remedy of D, which I see my light's on, may I? You can finish your sentence. We think that the remedy in D may cover the types of concerns you refer to, but I would emphasize this is a disproportionate, incongruent remedy. It subjects States to far more suits for unrelated health conditions than the Eleventh Amendment should permit. Thank you, Mr. Chief. Thank you, counsel. Mr. Foreman, you have 4 minutes remaining. This is not responsive to disability-based discrimination. The findings and the purpose of the Family Medical Leave Act make it clear that it is not responsive to gender-based discrimination. Hibbs, in fact, found that the FMLA was in response to gender-based discrimination. In making that finding, they did not differentiate between the different leave provisions. And indeed, if you move to Tennessee v. Lane, where Justice Rehnquist dissented drawing distinctions between disability-based discrimination and sex-based discrimination, stated that the task of identifying the constitutional right at issue in the Family and Medical Leave Act was an easy one. And that was his word, easy. It's responsive to gender-based discrimination. Chief Justice Roberts, I think your question about the Military Leave Act portion of the FMLA illustrates what Congress was doing here. When they added that almost 10 years later, they did not simply try to pigeonhole it into this is Section 5 legislation. In the circuits at that time, there was considerable debate as to whether that could be justified as proper abrogation of immunity. Roberts, I'm sorry. Roberts, do you think it would be — how would this case come out if we were dealing with subsection E? Do you think that should be treated separately than the prior ones? Yes, it should, because it was passed pursuant to a different constitutional power, and they provided, in fact, a different remedy, recognizing that the Commerce Clause could not — that Commerce Clause was the appropriate way to deal with this, and they provided a right of action by the United States in order to provide damages. If we think that you should look at these provisions separately, where, with respect to D, I'm looking at one of our prior precedents, has Congress unequivocally declared its intent to abrogate sovereign immunity? As to? Unequivocally. Not on the basis of implications from how the other provisions work. But if you do look at D, is there any place where Congress unequivocally declared its intent to abrogate State sovereign immunity? Well, I think it — yes, Your Honor. It's in — they provide that the State is an employer for purposes of coverage of the Family and Medical Leave Act. And if you go to 29 U.S.C. 2005, where it says a public entity is covered by the Family and Medical Leave Act, then that damages are available. It specifically includes State. In terms of my colleague's attempt to distance this case from Hibbs, in all due respect, we think that Hibbs did the heavy lifting here. It is the same legislative purpose. It is the same constitutional right. It is the same statutory scheme. And as this Court— The answer you gave to my request depends entirely on the conclusion that D is linked to A, B, and C, because otherwise you don't have the argument that it's precisely relief with respect to a discrimination under the Fourteenth Amendment. But you do, Your Honor. And that's the discussions we had earlier, that it's response to gender-based discrimination, the stereotypes that pregnant women will take leave. And so we think D would stand alone. But as the discussion today indicated, we think the appropriate way is to treat this as a comprehensive whole response of the gender-based discrimination and do, as you did in Hibbs, find that it is a congruent proportional response to gender-based discrimination. Thank you. Roberts.